W. T. MAYO and H. E. Harper, as Trustee and Co-Trustee in Bankruptcy of William Alton Gray, Bankrupt,

v.

Evelyn Brown PETTY.

Civ. A. No. 5440.

United States District Court
W. D. Louisiana,
Shreveport Division.

July 23, 1957.

John A. Carstarphen, Jr., Carstarphen & Carstarphen, Richard H. Switzer, Cleve Burton, and Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, La., for plaintiffs.

James J. Dormer, May & Woodley, William J. Fleniken and Brown & Fleniken, Shreveport, La., for defendant.

BENJAMIN C. DAWKINS, Jr., Chief Judge.

This is a plenary action brought under the Bankruptcy Act. Plaintiffs are the Trustees of the bankrupt estate of William Alton Gray. The defendant is Mrs. Evelyn Brown Petty, wife of A. Preston Petty, Jr. The suit seeks to avoid a deed and recover title to certain real property transferred by the bankrupt to Mrs. Petty on January 2, 1956. Gray was adjudicated a bankrupt on March 21, 1956, less than four months later.

Petty was Gray's office manager and bookkeeper. He and his wife had acquired title to the property in 1951. It was used as their homestead, and was subject to a recorded mortgage in favor of Prudential Insurance Company, which had an outstanding balance of about $12,000 in July, 1953. They were behind in their payments and the mortgagee was about to foreclose. To avoid this, or having to refinance, and because Prudential was willing to accept Gray as a debtor, he then being a construction

contractor with a substantial business, it was agreed that Petty would convey title to the property to Gray. The deed was executed on July 6, 1953, and recorded the next day, for a recited consideration of $8,000 in cash, and assumption by Gray of the unpaid balance due upon the mortgage. It has been stipulated that Gray was insolvent then, and continuously thereafter until his bankruptcy.

Actually, contrary to the deed's recitals, Gray did not pay Petty any cash, and the Pettys remained in possession of the property, where they reside even now. After the transfer, Gray paid several past-due instalments and made current payments on the mortgage as they fell due. He charged these amounts to Petty on his books. Petty was further indebted to Gray, on an account carried on the latter's books, for approximately $10,000.

More than five months after Petty executed the deed to Gray, and on December 17, 1953, Gray wrote Petty a letter in the following words and figures:

"December 17, 1953
"Mr. A. Preston Petty, Jr.,
"P. O. Box 626,
"Shreveport, Louisiana.
"Dear Preston:

"On or about July 6, 1953, a deed was executed by you transferring to me the following described property, to wit:

"Urban:

"Begin 675⅛ ft. south of NW corner of SW¼ of SW¼ of Sec. 29, T. 20, R. 13, run south 160 ft., thence east 307 ft., thence north 160 ft., thence west 307 ft., to the point of beginning, property lying in Benton, Bossier Parish, Louisiana.

"This being the same property financed by the Prudential Insurance Company, their loan No. 1019 322 FHA.

"It is agreed and understood that title was taken in my name for the purpose of refinancing the property and as security for the amount owed

on our books by you. There was no intent on my part to purchase said property, the transfer being made and title held in my name for the purpose aforementioned, the property to remain yours.

"At such time you can finance the property and reduce your indebtedness to the company, or by mutual agreement I will deed the property back to you.

"The purpose of this letter being to express in writing our intentions to avoid complications in the event anything happens to either or both of us.

"Sincerely,
"/s/ William A. Gray
"William A. Gray."

Later, on April 6, 1955, Gray wrote another letter to Petty, as follows:

"April 6, 1955
"Mr. A. Preston Petty, Jr.
"P. O. Box 626
"Shreveport, Louisiana
"Dear Preston,

"Calendar year 1954 was a year in which we made a substantial profit but because of our previous agreement that you are not to share in profits until such time as we have recovered the losses suffered in prior years, there will be no adjustment in your account with me at this time.

"However, since prospects for this year are extremely good at this time, I am today adjusting your weekly wages and in order not to cause you any additional burden do agree that the amount you now owe me will be paid by you out of future profits only. I will continue to make the payments on your residence and allow you a fixed expense to cover as in the past until such time as I should deed the property back to you.

"This letter is being written to express our mutual agreements and to avoid complications in the event

something should happen to either of us.

"Sincerely,

"W. A. Gray Construction Company

"By: /s/ William A. Gray

"William A. Gray

"WAG:pp"

Neither of these letters was recorded in the Conveyance or Mortgage records of Bossier Parish, Louisiana, and their introduction in evidence was objected to by plaintiffs at the trial.

As indicated above, on January 2, 1956, within less than four months before his bankruptcy, Gray executed a deed to the property to Mrs. Petty, for a recited consideration of $8,000 in cash and assumption of the balance due upon the Prudential mortgage. This deed was duly recorded on January 3, 1956. Actually, no cash was paid by Mr. or Mrs. Petty to Gray. This is the deed the suit seeks to avoid.

Plaintiffs' theory of the case carries a double thrust: 1) that the conveyance by Gray to Mrs. Petty was a voidable "preference", proscribed by Section 60, sub. a of the Act, 11 U.S.C.A. § 96, sub. a(1), and/or 2) it was "fraudulent" and voidable as to then existing creditors, and hence as to the Trustees, under Section 67, sub. d(2) (a, b), 11 U.S.C.A. § 107, sub. d(2) (a, b).

Defendant, relying upon the unrecorded counter letters, upon Gray's testimony before the Referee (he died on May 7, 1956), and upon the Pettys' continued possession of the property after July 6, 1953, contends: 1) that the Trustees "stand in the shoes" of the bankrupt, possessing no greater rights than he; 2) that the counter letters are binding on the Trustees, as they would have been on Gray, and continued possession of the property by the Pettys proves the deed to Gray was a mere simulation, which entitles them to ownership, Gray having held nothing more than a "bare legal interest" in it; 3) that the deed of January 2, 1956, merely restored title to the rightful owners; 4) hence, there was no "preference" and no "fraud"

upon the creditors. In an amended answer, filed since the trial, defendant alleges that the retransfer by Gray was in satisfaction of a valid vendor's lien, established in the Pettys' favor by State law, to secure the unpaid cash consideration of .$8,000 recited in the deed of July 6, 1953; and defendant " * * * asserts a recoupment and offset of the $8,000 which was never received from the bankrupt, against the indebtedness due to the bankrupt for this property."

For reasons presently to be stated, it is our opinion that plaintiffs should prevail. Their contentions are well taken, and defendant's position, as we shall show, is not sound. What was done also constituted a violation of State law and is well within the reach of Section 70, sub. e of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. e.

Before entering upon our analysis of the law applicable to the undisputed facts, it should be noted that all parties agree that the fact of conveyance having been made to Mrs. Petty, instead of her husband, makes no difference in the outcome of the case, for the property legally is presumed to be an asset of the marital community existing between them, and she was its agent, as if it had been transferred to Mr. Petty or to both. Anderson v. Edmondson, La.App., 8 So. 2d 131; Brown v. Tauzin, 185 La. 86, 168 So. 502. Nor is there any quarrel about his not having been named as a defendant, for the title was placed in her name, not his, and the Trustees seek to recover the record title from the one who nominally now holds it.

Proceeding from these preliminary dispositions to the merits of the case, we consider first the matter of the alleged "preference" under Section 60 subs. a and b. As here pertinent, those Sections read:

"*Sec. 60. Preferred Creditors.* a. (1) A preference is a transfer, as defined in this Act, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insol-

vent and within four months before the filing by or against him of the petition initiating a proceeding under this Act, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

\* \* \* \* \* \*

"b. Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent. Where the preference is voidable, the trustee may recover the property \* \* \* from any person who has received [it] \* \* \*."

The transaction of January 2, 1956, meets every requirement [1] of these Sections: 1) Although Petty then owed Gray some $10,000, Gray likewise owed Petty the $8,000 unpaid cash consideration stipulated in the deed of July 6, 1953. Gray, therefore, was a "debtor" of Petty to that extent; and he transferred [2] property standing in his name to Petty who 2) was Gray's "creditor", 3) for an "antecedent debt", in existence since July 6, 1953. This depleted Gray's

estate to the extent of the property's value, less the unpaid balance of the Prudential mortgage, and was effected 4) while Gray was insolvent, 5) within four months of his bankruptcy. This transfer 6) enabled Petty to obtain a greater percentage (100%) of the debt owed him by Gray than other creditors of the same class would receive; and when this was done 7) Petty, as Gray's office manager and bookkeeper, is bound to have known he was insolvent.

As will appear, these conclusions have been reached after full consideration of defendant's contentions as to the simulated nature of the conveyance from Petty to Gray, and study of the authorities she relies on to support her claim that the retransfer was not a "preference", because Gray never had more than a "bare legal interest" in the property. We also have considered defendant's assertion of a valid vendor's lien and her alleged entitlement to an offset and recoupment. Because of Louisiana's laws of registry and recordation, it is our opinion that none of these defenses, which we now analyze seriatim, is valid.

As between the parties to a transaction involving real estate, called "immovable property" in Louisiana's Civil Law, a pretended or simulated con-

---

1. 3 Collier on Bankruptcy, 14th Edition, § 60.02, pp. 755, 756:

   " \* \* \* Briefly stated, the elements of a preference under § 60a consist of the following: a debtor (1) making or suffering a transfer of his property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt [resulting in a depletion of the estate], (4) while insolvent, and (5) within four months of bankruptcy or of the original petition under Chapters X, XI, XII or XIII of the Act [11 U.S.C.A. §§ 501 et seq., 701 et seq., 801 et seq., 1001 et seq.], (6) the effect of which transfer will be to enable the creditor to obtain a greater percentage of his debt than some other creditor of the same class. The creditor's knowledge or reasonable cause to believe that a preference is effected by a transfer to him is no longer an element in determining whether such transfer constitutes a· preference under subdivision a of § 60. However, under

   subdivision b a preference is voidable by the trustee in bankruptcy only upon proof of the additional element that (7) the creditor receiving or to be benefited by the preference had reasonable cause to believe that the debtor was insolvent. \* \* \* "

2. "Transfer" is defined (11 U.S.C.A. § 1 (30) as:

   " 'Transfer' shall include the sale and every other and different mode, direct or indirect, of disposing of or of parting with property or with an interest therein or with the possession thereof or of fixing a lien upon property or upon an interest therein, absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, assignment, payment, pledge, mortgage, lien, encumbrance, gift, security, or otherwise; the retention of a security title to property delivered to a debtor shall be deemed a transfer suffered by such debtor."

veyance may be set aside as ineffective. In such a situation, parol evidence is admissible to prove the true ownership [3] and where the purported vendor remains in possession there is a presumption of simulation.[4] But to have any effect against creditors or third parties not privy to the simulation, counter letters must be recorded in the public records of the Parish where the property is located. LSA–Civil Code Article 2239 provides:

"*2239* [2236] (*N 1321*). *Effect of counter letters.*—Counter letters can have no effect against creditors or bona fide purchasers; they are valid as to all others; but forced heirs shall have the same right to annul absolutely and by parol evidence the simulated contracts of those from whom they inherit, and shall not be restricted to the legitimate [legitime]. [As amended, Acts 1884, No. 5.]"

LSA–Civil Code Article 2266 reads:

"All sales, contracts and judgments affecting immovable property, which shall not be so recorded [i. e. in the proper office], shall be utterly null and void, except between the parties thereto. The recording may be made at any time, but shall only affect third persons from the time of the recording. * * *"

LSA–R.S. 9:2721 reads:

"§ *2721. Filing in office of parish recorder*

"No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated; and neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties. Acts 1950, 2nd Ex. Sess., No. 7, § 1."

In principle this case is almost identical to State ex rel. Hebert v. Recorder of Mortgages, 175 La. 94, 143 So. 15, 16. There, the plaintiff owned certain real estate in New Orleans, upon which there was a homestead mortgage of $4,000. He made a nominal sale of the property to one Thiberville for a recited consideration of $1,500 in cash, and assumption of the mortgage, this deed being duly recorded. Actually, the sale was simulated and made for convenience only. Thiberville paid no cash and nothing on the mortgage which he nominally had assumed, nor was he expected to do so. Hebert remained in possession and continued to make payments on the mortgage. Thiberville, concurrently with execution of this deed, gave Hebert a counter letter acknowledging that he had no interest in the property and that it belonged to the latter, but the counter letter was not recorded.

The property stood in Thiberville's name for approximately three years. During that interval certain of his creditors obtained and recorded judgments against him. He later retransferred the property to Hebert, who then sued to cancel these judicial mortgages. The Court said that the failure to record the counter letter required a holding that the judicial mortgages were valid liens against the property and should not be cancelled. The Court said:

carious title, there is reason to presume that the sale is simulated, and with respect to third persons, the parties must produce proof that they are acting in good faith, and establish the reality of the sale."

See also Cole v. Cole, 39 La.Ann. 878, 2 So. 794; Bullard v. Nattin, 18 La. App. 75, 137 So. 551; cf. Joiner v. Ruark, 174 La. 615, 141 So. 76.

---

**3.** Citizens Bank & Trust Co. v. Willis, 183 La. 127, 162 So. 822; Harper v. Rosenblath, 1955, 227 La. 507, 79 So.2d 863.

**4.** LSA–Civil Code Article 2480:
"*2480* [2456]. *Seller retaining possession—Presumption—Proof of good faith.*—In all cases where the thing sold remains in the possession of the seller, because he has reserved to himself the usufruct, or retains possession by a pre-

"The creditors meant in Rev.Civ. Code, article 2239, are, of course, the creditors of the party giving the counter letter, and in whose name the property stands.

"And a counter letter relating to immovable property is, of course, a contract affecting immovable property, since it is the acknowledgment of a natural obligation to restore the property to its true owner and a promise, express or implied, to do so.

\* \* \* \* \* \*

"Articles 2239 and 2266, Rev.Civ. Code, must therefore be read together. Counter letters duly recorded affect all persons even creditors from the time of the recording. Counter letters not recorded are 'utterly null and void' except between the parties thereto.

\* \* \* \* \* \*

"In McDuffie v. Walker, 125 La. 152, 51 So. 100, this court held, that as to third persons, unrecorded acts affecting immovable property were so far nonexistent, that they might be deliberately ignored with entire good faith; for 'It cannot, however, be said that a third person perpetrates a fraud merely by treating as void, as to himself, a contract which the law in terms declares "shall be utterly null and void, except between the parties thereto;" ' (just as had actually been done, and approved of by the court, in Tulane v. Levinson, supra [2 La.Ann. 787]). 'To hold such doctrine is necessarily to hold that one who knows a particular contract to be denounced by the law as utterly void is bound in spite of the law to respect it as valid and binding, a paradox to which a court of justice would be unwilling to commit itself as an interpretation of law.' And the court said further: 'It is evident that whether a person acquires an interest in real estate to the extent of its value or part of its value as a mortgagee or as a vendee the principle involved in the application of the law of registry is the same; and hence if it be true that one may acquire a valid first mortgage, though he know at the time that as between the mortgagor and another there already exists an unrecorded mortgage upon the same property, it must also be true that one may acquire a valid title to such property, though he know that as between his vendor and another an unrecorded title has already been passed. The law makes *no distinction between mortgages and sales or between creditors and vendees or mortgagees; nor does it discriminate between those who acquire property with knowledge of unrecorded contracts and those who acquire without such knowledge. Its purpose is to establish and enforce as a matter of public policy upon the subject of the most important property right with which it deals the rule that unrecorded contracts affecting immovable property "shall be utterly null and void, except between the parties thereto."* No language could be plainer or more emphatic, and the courts have no more power to read into the rule established by it an exception, not contained in it, than they would have to read such an exception into the rule that a verbal sale of immovable property shall not affect third persons.' (Emphasis supplied.)

\* \* \* \* \* \*

"We have cited these few cases out of the very large number holding to the same effect, because these cases show that in this state registry is not a mere matter of notice alone, but *a matter of public policy upon a 'most important property right'; and that considerations of equity cannot prevail against it. 'With us, those laws [of registry] are considered as founded on public policy, and the want of registry cannot be supplied. In the other States they are viewed differently, and notice in any form is held to be equivalent to registry.'* Lockett v. Toby,

10 La.Ann. 713, 715. (Emphasis supplied.)

\* \* \* \* \* \*

"Hence, all consideration of equity being banished, the creditors of a vendor who record judgments against him after he has sold the property but before the purchaser records his deed may not only ignore the purchaser with the unrecorded title, but acquire a judicial mortgage superior in rank to that of all judgment creditors of the purchaser without exception; since 'there can be no actual owner of immovable property, so far as third persons are concerned, other than the owner of record; for, except as between the parties thereto, an unrecorded conveyance is "utterly null and void," and conveys no title.' Baker v. Atkins, 107 La. 490, 32 So. 69, 70.

\* \* \* \* \* \*

"The equity doctrine on which relator relies is that a judgment creditor acquires no lien against property standing in the name of his judgment debtor, but in which that debtor has no beneficial interest, unless the judgment creditor can successfully plead an estoppel in pais against the actual owner of the property.

"But, as we have endeavored to show, *registry is a matter of public policy in this state, against which considerations of equity cannot prevail; and 'there can be no actual owner of immovable property, so far as third persons are concerned, other than the owner of record.'*" (Emphasis supplied.)

Contrary to defendant's argument that the Trustees here stand in Gray's shoes, and have no greater rights than he would have had, is the following statement of law from 4 Collier on Bankruptcy, § 70.04, pp. 946–950, citing numerous supporting authorities:

"The courts are frequently moved to reassert the general rule that the Act 'does not vest the trustee with any better right or title to the bankrupt's property than belongs to the bankrupt or his creditors at the time the trustee's title accrues.' This is true in that the bankruptcy trustee is not a *bona fide* purchaser or encumbrancer for value, but takes the property subject to all *valid* claims, liens and equities. Thus it has been said that the trustee 'stands in the shoes of the bankrupt' and has no better title than the bankrupt had at the time of the filing of the petition. Nevertheless, these general pronouncements are subject to well-recognized exceptions created by the Bankruptcy Act itself, through which the trustee is given powers to assert claims against property in the hands of others *where the bankrupt would be estopped to act* and, in some cases, where there are no creditors who could assert such claims. *Thus the trustee may not only set aside any transfer or avoid any claim that the bankrupt could have avoided, but he may move to set aside conveyances and transfers of the bankrupt which are* fraudulent or otherwise *voidable under state or federal law, transfers of the bankrupt deemed fraudulent under the Act itself,* certain liens obtained on the bankrupt's property through legal or equitable proceedings within four months of bankruptcy *and preferential transfers of the bankrupt's property effected within the four months'* period. The trustee, moreover, is vested, as to all property in possession or control of the bankrupt at the date of bankruptcy, with the rights, remedies and powers of a creditor then holding a lien thereon by legal or equitable proceedings, whether or not such a creditor actually exists; *and as to all other property, the trustee is deemed vested with the rights, remedies and powers of a judgment creditor then holding an execution duly returned unsatisfied, whether or not*

*such a creditor actually exists.* (Emphasis supplied.)

"It is quite apparent, therefore, that the Act confers certain rights and powers on the trustee over and above those accorded the bankrupt and, in some cases, the bankrupt's creditors."

■ On the strength of these authorities, it is our view that the Trustees here occupy a position approximating that of the judgment creditors in *Hebert*; and that the unrecorded counter letters issued by Gray to Petty can have no probative effect under Louisiana law. They may not be considered and do not constitute an effective bar to the Trustees' claim because they are "utterly null and void" as to them.

■ In support of her contention that Gray never held more than a "bare legal interest" (and hence had no "beneficial interest") in the property, the transfer of which she contends was not a "preference", and was not "fraudulent", defendant cites Capital Finance Corporation v. Leveen, 4 Cir., 217 F.2d 36; Bryce v. National City Bank of New Rochelle, 2 Cir., 93 F.2d 300; Strongin v. International Acceptance Bank, Inc., 2 Cir., 70 F.2d 248; and Frederick v. Baxter Arms Corporation, 2 Cir., 107 F.2d 732. We have studied those decisions, and conclude that they are not applicable here because they did not involve laws of registry in the States from which they arose. Here, Louisiana's laws of registry and recordation are paramount. They are controlling. In so far as creditors, third parties, third persons—*these Trustees*—are concerned, Gray held a full, perfect title to the property standing in his name on the records of Bossier Parish. He did not hold simply a "bare legal interest". By virtue of the "strong-arm clause" of Section 70, sub. c of the Bankruptcy Act,[5] the Trustees are entitled to recover the property here sued for notwithstanding the unrecorded counter letters or any other "secret claims or equities" which existed between Gray and Petty. To the same effect are McKay v. Trusco Finance Company of Montgomery, Alabama, 5 Cir., 198 F.2d 431; Powers v. Johnson, 8 Cir., 71 F.2d 48; and Constance v. Harvey, 2 Cir., 215 F.2d 571, certiorari denied 348 U.S. 913, 75 S.Ct. 294, 99 L.Ed. 716. Likewise, while defendant is correct in claiming that Louisiana law provided Petty with a vendor's lien for the unpaid portion of the purchase price due by Gray,[6] still, by virtue of the authorities cited above, and a provision of the Louisiana Constitution, it, too, is void and unenforceable as to Gray's creditors and Trustees because it was not recorded.[7]

■ Passing to the next point made by plaintiffs, Section 67, sub. d(2) (a) of the Bankruptcy Act, 11 U.S.C.A. § 107, sub. d(2) (a), provides:

"Every transfer made and every obligation incurred by a debtor within one year prior to the filing of

---

5. 11 U.S.C.A. § 110, sub. c:

" * * * The trustee, as to all property in the possession or under the control of the bankrupt at the date of bankruptcy or otherwise coming into the possession of the bankruptcy court, shall be deemed vested as of the date of bankruptcy with all the rights, remedies, and powers of a creditor then holding a lien thereon by legal or equitable proceedings, whether or not such a creditor actually exists; *and, as to all other property, the trustee shall be deemed vested as of the date of bankruptcy with all the rights, remedies, and powers of a judgment creditor then holding an execution duly returned unsat-* isfied, *whether or not such a creditor actually exists.*"

6. LSA–Civil Code Article 3249:
   "Creditors who have a privilege on immovables, are:
   "1. The vendor on the estate by him sold, for the payment of the price or so much of it as is unpaid, whether it was sold on or without a credit."

7. Art. 19, § 19, La.Const. of 1921, LSA:
   "No mortgage or privilege on immovable property, or debt for which preference may be granted by law, shall affect third persons unless recorded or registered in the parish where the property is situated, in the manner and within the time prescribed by law, * * *."

a petition initiating a proceeding under this Act by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred *without fair consideration* by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; * * *." (Emphasis supplied.)

It will be noted at once that the key words of this provision are "without fair consideration". Section 67, sub. d (1) (e), 11 U.S.C.A. § 107, sub. d(1) (e), defines that term as follows:

"For the purposes of, and exclusively applicable to, this subdivision d: * * * (e) consideration given for the property or obligation of a debtor is 'fair' (1) when, *in good faith*, in exchange and *as a fair equivalent* therefor, property is transferred or an antecedent debt is satisfied, * * *." (Emphasis supplied.)

4 Collier on Bankruptcy, § 67.33, pp. 345–350, makes these comments on the subject:

"* * * This definition of *fair consideration* is taken directly from § 3 of the Uniform Fraudulent Conveyance Act with slight revisions made in word order, presumably in the interest of clarity.

"*A consideration to be fair need not be a present consideration; satisfaction or securing of an antecedent debt will qualify.* Except in the case of security transactions, *however, the consideration must be a 'fair equivalent' for the property transferred or obligation incurred.* Where property is transferred or an obligation incurred for purposes of security, *it is only necessary that its value not be disproportionately large as compared with the amount of the advance or debt secured. Good faith on the part of the giver of the consideration is indispensable in every case, even though a fair equivalent passes.*

* * * * * *

" 'Fair' consideration is obviously more than 'good and valuable consideration.' * * * *While the burden of proof (or risk of persuasion) with respect to the insufficiency of consideration would seem properly to rest on the trustee, the burden of going forward with the evidence has been held to be shifted to the defendant under the Uniform Act by a showing that the conveyance recited merely a nominal consideration. Where an instrument of transfer incorrectly recites consideration, the actual consideration may nevertheless be shown by extrinsic evidence.*

"*Whether a fair consideration has been given for a transfer must depend on all the circumstances of the case. Thus, whether a release of rights under a contract or the surrender of a lease is made for a fair consideration must depend upon whether a good bargain is being given up or a burdensome obligation is being discharged. Fairness in every case is largely a question of fact,* as to which considerable latitude must be allowed to the trier of the facts. * * *" (Emphasis supplied.)

Applying these rules to the facts here, we observe that, in executing the deed to Petty on January 2, 1956, Gray not only transferred the title in an effort to repay an antecedent debt to his faithful and favored employee; he also surrendered his title to property held " * * as security for the amount owed on our books by you", according to his letter of December 17, 1953. He thereby attempted to deprive his creditors of property which otherwise would have secured payment of the more than $10,000 owed by Petty. Moreover, he remained liable to Prudential for his assumption of the Petty mortgage. This was not "a fair consideration" and must be considered "fraudulent" as to Gray's then existing creditors (of which there were many), regardless of "his actual intent". Coming as it did, barely two months before his bankruptcy, when both he and

Petty surely knew of his insolvency—the immediacy of his impending financial disaster—we can only conclude that there was at least some element of deliberate fraud, within the interdiction of Section 67, sub. d(3), 11 U.S.C.A. § 107, sub. d(3). We find, therefore, that the Trustees are entitled to recover this property on grounds of fraud, both actual and implied.

■ There is still another reason for holding in plaintiffs' favor. Section 70, sub. e(1), 11 U.S.C.A. § 110, sub. e(1), provides:

"*A transfer made or suffered* or obligation incurred *by a debtor adjudged a bankrupt* under this Act *which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this Act, shall be null and void as against the trustee of such debtor.*" (Emphasis supplied.)

The LSA–Civil Code of Louisiana makes the following provisions with respect to transfers of property by a debtor in favor of a preferred creditor:

"*Art. 1970* [1965]. *Contracts fraudulent as to creditors—Annulment.*—The law gives to every creditor, when there is no cession of goods, *as well as to the representatives of all the creditors where there is any such cession, or other proceedings by which they are collectively represented, an action to annul any contract made in fraud of their rights.*" (Emphasis supplied.)

"*Art. 1971* [1966]. *Insolvency of debtor condition precedent to annulment action.*—This action can only be exercised when the debtor has not property sufficient to pay the debt of the complaining creditor, *or of all his creditors where there has been a cession, or any proceeding analogous thereto.*" (Emphasis supplied.)

"*Art. 1980* [1975]. *Gratuitous contracts—Presumption of fraud.*—If the contract be purely gratuitous, it shall be presumed to have been made in fraud of creditors, if, at the time of making it, the debtor had not over and above the amount of his debts, more than twice the amount of the property passed by such gratuitous contract."

"*Art. 1984* [1979]. *Obligee with knowledge of debtor's insolvency—Fraud presumed.*—Every contract shall be deemed to have been made in fraud of creditors, when the obligee knew that the obligor was in insolvent circumstances, and when such contract gives to the obligee, if he be a creditor, any advantage over other creditors of the obligor.*" (Emphasis supplied.)

"*Art. 1985* [1980]. '*Insolvent circumstances*' *defined—Proof.*—By being in insolvent circumstances is meant, that the whole property and credits are not equal in amount, at a fair appraisement, to the debts due by the party. * * *"

As already noted, Petty knew that Gray was insolvent when the deed of January 2, 1956, was executed; and he received the substantial advantage over other creditors of being paid the full amount of Gray's debt to him, while simultaneously there was released to him the property which had been held as security for his indebtedness to Gray. This is another reason why we must decree the return of the property to the Trustees for the benefit of all the unsecured creditors.

Accordingly, there will be judgment for plaintiffs as prayed for, decreeing the nullity of the deed of January 2, 1956, from Gray to Mrs. Petty, and recognizing that title to the property is vested in the Trustees.

This appears to be, and is, indeed, a harsh result—taking the Pettys' homestead from them—especially since Gray did not directly pay them one cent for

it, but we must follow the law as we understand it. In their wisdom, Congress and the Louisiana Legislature have formulated these rules for the greater good of the greater number, and so it must be.

■ Nevertheless, it would appear that, under section 68 of the Bankruptcy Act, 11 U.S.C.A. § 108, the Pettys are entitled to set-off, against the amount he owes the bankrupt estate, the value of his equity in the property at the time it was conveyed to Gray on July 6, 1953. This may be more or less than the recited $8,000 cash consideration, which is not binding on either plaintiffs or the Pettys, because it was purely an arbitrary figure. There are other items which, if properly proven, may be considered in striking a fair balance of accounts, such as rent for use of the premises, mortgage, tax and insurance payments, any physical maintenance or improvements made on the property since it was transferred to Gray, etc. Because of this, and pursuant to Rule 53, Fed.Rules Civ.Proc., 28 U.S.C.A., the matter of the Pettys' entitlement to a set-off, and all matters of accounting in that regard, will be referred to the Honorable Le Roy Smallenberger, Referee in Bankruptcy for this District, who is to have and exercise all of the powers and responsibilities provided for by that Rule in resolving these questions and reporting thereon. In making this reference, we specially find that there was no intent, on the part of either Gray or Petty, in execution of the deed of January 2, 1956, to thereby create in Petty a right to a set-off or counterclaim, i. e., the transfer was not made "with a view to such use", within the meaning of Section 68, sub. b(2). Rather, the sole purpose of that deed was the attempted restoration of title, and release of the property as security, to Petty, who is not to be denied the right to set-off or counterclaim on that account.

A proper decree, in accordance with these rulings, should be prepared by plaintiffs' counsel, and, after approval as to form by defendant's counsel, should be submitted to the Court for signature.