W. T. MAYO, H. E. Harper and Jack Murrell, Trustees in Bankruptcy of Twin City Construction Company, Inc.

v.

PIONEER BANK & TRUST COMPANY.

Civ. A. No. 5516.

United States District Court
W. D. Louisiana,
Shreveport Division.

Nov. 20, 1958.

Wilburn V. Lunn, Richard H. Switzer, Cleve Burton, Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, La., John A. Carstarphen, Jr., Carstarphen & Carstarphen, Shreveport, La., for plaintiffs.

Turner B. Morgan, Morgan, Baker, Skeels, Middleton & Coleman, Shreveport, La., Paul M. Hebert, Breazeale, Sachse, Wilson & Hebert, Baton Rouge, La., for defendant.

BENJAMIN C. DAWKINS, Jr., Chief Judge.

## Findings of Fact and Conclusions of Law

This cause having been submitted for decision, by the Court without a jury, the Court having considered the pleadings, the stipulations of counsel, the exhibits, the testimony of the witnesses, and the briefs of counsel, hereby makes and enters the following Findings of Fact and Conclusions of Law, pursuant to Rule 52(a), Fed.Rules Civ.Proc., 28 U.S.C.A.:

This is an action by the Trustees in Bankruptcy of Twin City Construction Company, Inc., against Pioneer Bank & Trust Company of Shreveport, Louisiana, seeking to recover the total sum of $69,145 alleged to have been received by defendant and claimed to be voidable transfers under Sections 60, sub. b and 67, sub. d of the Bankruptcy Act, 11 U.S.C.A. §§ 96, sub. b, 107, sub. b. The items sought to be recovered logically and conveniently should be placed in three separate categories as to which separate Findings of Fact and Conclusions of Law will be entered. They are as follows: (1) A claim for $50,125; (2) another for $9,000; and, (3) still another for $10,020. Preliminary to summation of the detailed facts and a statement of our particular conclusions of law, the following general background statement is made for a clearer understanding of the nature of this proceeding.

### General Statement

An involuntary petition in bankruptcy was filed against W. A. Gray, d/b/a W. A. Gray Construction Company, on March 12, 1956, in proceeding No. 7729 on the Bankruptcy Docket of this Court. Thereafter, on March 21, 1956, he was adjudicated a bankrupt upon his voluntary petition. He died on May 7, 1956. An involuntary petition was also filed against Twin City Construction Company by the Home Indemnity Company on the 13th day of April, 1956, in proceeding No. 7751 on the Bankruptcy Docket of this Court, and on April 21, 1956, Twin City Construction Company voluntarily was adjudicated a bankrupt. Gray was the sole stockholder of Twin City Construction Company and to a large extent, during the times in question, commingled the affairs of that corporation with his individual business.

William Alton Gray for many years had engaged in the construction business under the name of W. A. Gray Construction Company. Outwardly, he appeared to be quite successful. Whatever financial difficulties he had, he was able successfully to cover up and surmount until January, 1956, when he concluded he could not continue in business.

When Pioneer Bank & Trust Company was organized in 1945 and opened for

business, Gray became one of its depositors and customers. (R. 274, 276.) In the regular course of business, the Bank made many loans to Gray to finance his construction business, permitting him to start and carry forward individual construction contracts (see Exhibit D–15, listing Bank loans to Gray back to 1950). Throughout its course of dealings with Gray, and until January of 1956, the Bank had never sustained any loss on any loan made to him individually or to his business, W. A. Gray Construction Company (R–277). The account was handled by the Bank's President, Rupert Campbell, who approved loans (R–235), clearing such matters with the Discount Committee when necessary. It is apparent that those who did business with Gray had utmost confidence in his ability to meet his financial obligations. This included Home Indemnity Company, whose representative testified that he was willing to and did authorize the writing of the bond here involved, if Gray would give his personal indemnity (R–100). The Bank, in discussing various loan transactions with him, repeatedly asked for financial statements, which were not furnished, but his record of payment through the years was good and this request was not pressed. The Bank considered that the general securities it held were adequate to protect its loans.

The bonding company's representative, Mr. Scott, was much impressed with Mr. Gray's physical plant in June of 1955. The personal financial statement, introduced as Exhibit P–2, furnished to the bonding company at that time, was entirely satisfactory on its face. It showed a net worth of $293,952.45, but this did not accurately reflect the true situation.

Gray's affairs thus appeared outwardly to be not only solvent, but prosperous, to those with whom he dealt. His true financial status, however, as described by his office Manager, Preston Petty, presents an entirely different hindsight picture. Mr. Petty testified that if Mr. Gray had been forced to liquidate at any time after 1951, he would have been insolvent. Petty also testified as to the procedure followed by Gray so as to keep the Bank from learning of his true financial status (R–174, 175, 176). He also described how Gray would borrow and pay back and borrow again (R–176), always saying that they had worked out of a bad capital situation once and could do it again, e. g., "It may take four or five years, but we will pay out again." (R–147.) Petty also testified that Gray had no intention of ever "beating" anyone out of anything, but had to have capital and bonds and would do what it took to get a bond (R–147). Just prior to the collapse of his operations in January of 1956, Gray had as many as ten large government construction contracts going on in the State of Arkansas (R–191). He had money coming in on these government contracts and, undoubtedly, hoped to utilize the profits to recoup his negative capital situation.

As stated, the true capital condition known to Petty and Gray obviously was not communicated to the Bank (R–174–176). Gray had established a line of credit at the Bank, had posted collateral mortgages and pledges to secure loans to be made to him, and, in addition, when loans were made on individual contracts, a pledge was taken by the Bank covering the proceeds of the individual contract on which the loan was made (see Exhibit D–9, Pledge Agreement on $19,000 loan and, Exhibit D–10, Pledge Agreement on $10,000 loan). The Bank held as general collateral security a $40,000 mortgage on Gray's home, a $20,000 mortgage on his office building, a $20,000 mortgage on his equipment, a pledge of the stock of W. A. Gray, Inc., owner of the property known as Blair Apartments (R–209).

This shows the apparently substantial character of Gray's business and account with the Bank and justified the course of dealing and confidence the Bank's President had in him (R–210). His line of credit was such that the Bank, in the normal course of business, frequently honored payroll and materials checks, and other withdrawals, even though overdrafts often occurred (see Testimony of Mr. Friedman, R–251, 252).

## 1. The $50,000 Loan To W. A. Gray And Its Repayment

### Findings of Fact

**1.**

Twin City Construction Company, Inc., was organized in 1951. William A. Gray was the sole stockholder. This corporation had been dormant and conducted no business as such for several years (R–219).

**2.**

On May 28, 1955, Gray approached the Bank, through Mr. Campbell, and requested a loan of $50,000, stating that he had decided to reactivate Twin City Construction Company and that he thereafter was going to conduct his construction operations through Twin City Construction Company, Inc. In support of this request, Gray stated that his health had been poor and that he desired to do business on construction contracts in the corporate form to insure continuity and to avoid personal liability (R–220). He also stated that he expected to obtain additional capital from another party who had expressed a desire to enter the construction business with him (R–220). The evidence established that similar statements were made by Gray to representatives of the Home Indemnity Company when Gray made application for a bond on a construction contract at Blytheville, Arkansas, which was eventually awarded by the United States Government to Twin City Construction Company (see testimony of Mr. Scott, R–100).

**3.**

Pioneer Bank & Trust Company, at Gray's request, and relying upon his representations and upon its long continued course of satisfactory banking relations with him, made a loan of $50,000 as requested on May 28, 1955. The Bank took Gray's personal note for that amount, payable in fifteen days, to its own order (Exhibit P–3). The entire $50,000, at Gray's direction, was deposited simultaneously by the Bank in the checking account of Twin City Construction Company, Inc., maintained at Pioneer Bank (Exhibit P–4). Deposit slip dated May 28, 1955, in the amount of $50,150 was stipulated at the trial to include this $50,000. When this was done, the Bank held collateral mortgages on Gray's office and yard property, a $40,000 mortgage on his home and a pledge of all of the capital stock of the Blair Apartments.

**4.**

Pioneer Bank & Trust Company, through the $50,000 loan, in fact augmented the funds of Twin City Construction Company *pro tanto*. At no time was this sum, or any part of it, withdrawn from the bank account prior to its repayment to the Bank on June 8th or 9th, 1955, as hereinafter related. The sum of $50,125 which the Trustees seek to recover in this action is in fact the identical $50,000 constituting the proceeds of the loan referred to. But for the loan of $50,000.00 made by the Bank as above related, there would have been no asset or credit item in that amount reflected in the bank account of Twin City Construction Company, Inc.

**5.**

On the 8th day of June, 1955, Gray reported to the Bank that the purpose for which the loan had been made could not be carried out; and the transaction was closed by repayment of $50,125 to the Bank by check signed by Gray as President of Twin City Construction Company payable to the Bank (Exhibit P–6), covering the principal and accrued interest. The check was dated June 12, 1955, but actually was cleared on June 9, 1955. The issuance of the check by Gray in payment of the loans was in practical effect a reversal of the bookkeeping entry under which the $50,000 had been credited to the account of Twin City Construction Company, the entire transaction consuming only twelve days. Thus it is found as a fact that, within a period of only twelve days, the loan was made, the funds were credited to Twin City, the Bank was told the purpose was impractical and the exact money loaned was repaid to the Bank which had furnished it prior to its withdrawal. There

can be no question as to Gray's authority to represent Twin City Construction Company, through proper board resolutions, in all of its transactions with the Bank (see Exhibits D–2, D–3, D–4), which in fact acted in good faith.

### 6.

Gray apparently issued stock to himself in Twin City Construction Company for $50,000, but the Bank was unaware of this at the time of the transaction. When it suited his purposes, Gray showed the stock to have been issued to himself. The Court finds as a fact that the Pioneer Bank & Trust Company had no knowledge of the issuance of the stock until a considerably later date, and knowledge thereof is not chargeable to the Bank during the period in question. We further find as a fact that the Bank had no knowledge of any intention that Gray may have had to issue $50,000 in stock to himself in return for the proceeds of the loan.

### 7.

Prior to June 15, 1955, Gray had made application, on behalf of Twin City Construction Company, to Home Indemnity Company for a Contractor's Performance Bond. On June 15, 1955, which was about a week after the $50,000 loan had been repaid to the Bank, Home Indemnity Company sent its representative, Mr. Scott, to Shreveport for the purpose of investigating the application. Mr. Scott called at the Pioneer Bank with a Mr. Parker, one of Home's local agents. From Scott's own testimony it is clear and undisputed that he asked the Bank for verification of the $50,000 balance, as shown in Twin City's financial statement furnished by Gray, as of May 31, 1955, and that the balance of $50,000 as of that date was thus verified, by an officer of the Bank who had not handled, and was not familiar with, the details of Gray's or Twin City's accounts. These representatives of the bonding company did not attempt to verify, or even inquire about, whether the $50,000 was on June 15, 1955, still on deposit in the account of Twin City Construction Company. This constituted gross carelessness on their part for if inquiry had been made as to the balance on June 15, 1955, the fact that the credit had been withdrawn and paid to the Bank would have been discovered, and undoubtedly the bond would not have been written. The Court finds that Mr. Lindsey was the representative of the Bank who on June 15, 1955, verified the statement as of May 31, 1955, as requested by Scott, and that neither Mr. Lindsey nor any other representative or officer of the Bank was in any way a party to any misrepresentation of any character to the representatives of the bonding company. The bond was not written until the 21st day of June, 1955, after Home Indemnity Company had conducted its own investigation and after it had satisfied itself with the personal guaranty of Gray. Gray also had given Home Indemnity Company the same reasons for converting his activities over to corporate form as he had given to Mr. Campbell, President of the Bank. The Bank was as much deceived by Gray's representations in this respect as was the bonding company.

### 8.

Pioneer Bank & Trust Company, by letter dated June 9, 1955 (Exhibit P–24), listed all of Gray's personal loans in a letter to Newark Insurance Company, another bonding company reinsuring a portion of the bond, which letter was dispatched late in the afternoon of June 9, 1955, and which was based on information compiled by the Loan and Discount Department of the Bank. The Court finds as a fact that the letter was issued in good faith and reflected the then existing facts under which the $50,000 loan had been previously repaid, and for this reason was not included in the list of outstanding loans chargeable against Gray. Gray undoubtedly used the credit balance of $50,000 on May 31, 1955, in setting forth assets of Twin City in making application for the bond written by Home Indemnity Company and he further used a financial statement and audit report showing that on May

31, 1955, there was a $50,000 bank balance to the credit of Twin City. The Bank was not a conscious party to any of these misrepresentations by Gray, but did furnish routine verification of balances as of May 31, 1955, the only date as of which verification was requested. Gray did not make disclosure to the Bank of any intention he may have had to use the bank balance of Twin City as a credit item to obtain a bond and the Bank was equally deceived by his fraudulent representations as to the intended purpose of the loan in that respect.

### 9.

The evidence does not support the factual contention made by plaintiffs that a representative of the Bank stated to the representative of the bonding company that there was no note of Gray supporting the $50,000.00 deposit or that the deposit of May 28, 1955, represented personal savings of Mr. Gray and not a loan. In this respect the Court believes the testimony of the Bank's witness denying that any such representation was made.[1]

### 10.

During the period when Twin City was activated by the action of Gray, that is, from May 28, 1955, until it was adjudicated a bankrupt on April 21, 1956, it had only one contract, the Blytheville, Arkansas, government contract. Home Indemnity Company, as its surety, eventually paid bills of Twin City in the approximate amount of $52,130.42 to complete the contract. The record does not establish that Twin City was insolvent as of the date of the repayment of the $50,000 loan to the Bank, June 8, 1955, or as of June 22, 1955, when the bond of Home Indemnity Company was written.

### Conclusions of Law

### 1.

Section 67, sub. d(6) of the Bankruptcy Act, with exceptions therein noted, annuls, in favor of the Trustees in Bankruptcy, those transfers which are fraudulent as defined in the Act. The applicable statutory provisions are:

67, sub. d(6) "A transfer made or an obligation incurred by a debtor adjudged a bankrupt under this title, which is fraudulent under this subdivision against creditors of such debtor having claims provable under this title, shall be null and void against the trustee, except as to a bona fide purchaser, lienor, or obligee for a present fair equivalent value: Provided, however, That the court may, on due notice, order such transfer or obligation to be preserved for the benefit of the estate and, in such event, the trustee shall succeed to and may enforce the rights of such transferee or obligee: And provided further, That such purchaser, lienor, or obligee, who without actual fraudulent intent has given a consideration less than fair, as defined in this subdivision, for such transfer, lien, or obligations, may retain the property, lien, or obligations as security for repayment."

67, sub. d(1)(e) "Consideration given for the property or obligation of a debtor is 'fair' (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied, or (2) when such property or obligation is received in good faith to secure a present advance or

---

[1]. Counsel for the trustees in their second reply brief argue: "The Bank, with full knowledge of Gray's shenanigans, informed Mr. Scott, of the bonding company, *before* the bond was written, that the $50,000 deposited in the account of Twin City was not the proceeds of any loan to Gray, knowing full well that it was, being a party to Gray's depositing the proceeds of the loan made by him to the account of Twin City". (Second Reply Brief, p. 2.) The Court does not accept this conclusion of fact, finding, on the contrary, that the preponderance of the credible testimony is to the effect that the Bank had no such knowledge of Gray's plans and no such misrepresentations were, in fact, made by the Bank.

antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained."

### 2.

As is pointed out in Collier's Bankruptcy Manual, (Oglebay, Kelliher and Newkirk) (1948), p. 845, in discussing Section 67, sub. d:

"Whether a fair consideration has been given for a transfer *must depend on all of the circumstances of the case.* Fairness in every case is largely a question of fact, *as to which considerable latitude must be allowed to the trier of the facts.*" (Emphasis supplied.)

### 3.

The Bankruptcy Act defines the terms "debt" and "creditor" in Section 67, sub. d(1) as follows:

"(d) For the purposes of, *and exclusively applicable to, this subdivision:* * * * (b) 'debt' is any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent; * * * (c) 'creditor' is a person in whose favor a debt exists." (Emphasis supplied.)

### 4.

Pertinent and applicable articles of the LSA–Civil Code include the following:

Article 1896: Cause and want of cause defined.—"By the cause of the contract, in this section, is meant the consideration or motive for making it; and a contract is said to be without a cause, whenever the party was in error, supposing that which was his inducement for contracting to exist, when in fact it had never existed, or had ceased to exist before the contract was made."

Article 2292: "Certain obligations are contracted without any agreement, either on the part of the person bound, or of him in whose favor the obligation takes place.

"Some are imposed by the sole authority of the laws, others from an act done by the party obliged, or in his favor.

"The first are such engagements as result from tutorship, curatorship, neighborhood, common property, the acquisition of an inheritance, and other cases of a like nature.

"The obligations, which arise from a fact, personal to him who is bound, or relative to him, result either from quasi contracts, or from offenses and quasi-offenses."

Article 2293: "Quasi contracts are the lawful and purely voluntary act of a man, from which there results any obligation whatever to a third person, and sometimes a reciprocal obligation between the parties."

Article 2294: "All acts, from which there results an obligation without any agreement, in the manner expressed in the preceding article, form quasi contracts. But there are two principal kinds which give rise to them, to wit: The transaction of another's business, and the payment of a thing not due."

Article 2300: "All persons, such even as are incapable of consent, may, by the quasi contract, resulting from the act of a third person, become either the object or the subject of an obligation; because the use of reason, although necessary on the part of the person whose act forms the quasi contract, is not requisite in those by whom, or in whose favor, the obligations resulting from the act, are contracted."

Article 2301: "He who receives what is not due to him, whether he receives it through error or knowingly, obliges himself to restore it to him from whom he has unduly received it."

Article 2315: "Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it; * * *."

**5.**

Under the provisions of the Bankruptcy Act relied upon by plaintiffs, a transfer within one year prior to the filing of a petition in bankruptcy is not fraudulent unless it is made or incurred "without fair consideration".[2] In light of the statutory definition of fair consideration as that term is used in the Bankruptcy Act above quoted, the Court finds as a conclusion of law that the repayment to the Pioneer Bank & Trust Company of the $50,000 loan under the facts and circumstances of this case cannot be said to be "without fair consideration" as that term is used in Section 67, sub. d(2) and for the basic reason, in addition to the reasons further stated, an essential element of a voidable transfer is lacking under the Act. The Court also finds that the repayment made to the Bank of the identical bookkeeping credit reflecting the proceeds of the loan never withdrawn was as a matter of law supported by a fair equivalent in value under Section 67, sub. d(6) in that the transaction must, under the provisions of law quoted, be viewed in its entirety and in its net effect. In applying these provisions of the Bankruptcy Act this Court must consider the fact that the Bank was repaid the identical money it had furnished to Gray in the Twin City account. If Gray had not repaid the Bank but had revealed the facts to it, there would have been a legal obligation on the part of Twin City to make the reimbursement. In other words, the circumstances under which the loan was made were sufficient under the law of Louisiana to give rise to an antecedent indebtedness from Twin City Construction Company to the Bank. Such liability on the part of Twin City properly may be predicated either upon the principle of quasi contract (unjust retention of a benefit) or delictual responsibility. See the Civil Code Articles above cited.

Though the facts establish that the loan was initially made on the credit of Gray, the proceeds inured only to the benefit of Twin City and the loan was made for a specific and definite purpose, to-wit: to enable Gray thereafter to carry out his construction business as Twin City Construction Company instead of as W. A. Gray Construction Company. The purpose for which the loan was made having failed, according to the representations made by Gray to the Bank, and accepted by the Bank in good faith, established, under the quoted Articles of the Louisiana Civil Code, a legal right in the Bank to demand reimbursement from Twin City of the proceeds of the loan. If the Bank had the legal right to compel Twin City to make reimbursement when Gray stated the purpose of the loan had failed, the action of Gray in causing the loan to be paid was not a transfer "without fair consideration" within the meaning of Section 67, sub. d(2) of the Bankruptcy Act. Moreover, the Court finds that the Bank was deceived by the active misrepresentations of fact made by Gray and Twin City, therefore, would be liable delictually to make reimbursement to the Bank. The liability so resulting constitutes a "debt" as that term is broadly and specially defined in the Bankruptcy Act and entitles the Bank to the protection afforded to a bona fide "obligee" under the statute. The numerous authorities sustaining a corporation's liability for fraud are collected in 19 Corpus Juris Secundum, Corporations, § 1278. The Bankruptcy Act recognizes that satisfaction of an "antecedent debt" is one meaning of the term giving a "fair" consideration for the property. The circum-

---

2. "Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent * * * (b) as to then existing creditors and as to the other persons who become creditors during the continuance of a business or transaction, *if made or in-* *curred without fair consideration* by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to this actual intent; * * *." § 67, sub. d (2) (b), 11 U.S.C.A. § 107, sub. d (2) (b). (Italics supplied.)

stances of this case are unusual and the Court, viewing the matter in its entirety, considers that this is, in fact and in law, a situation in which the Court is called upon to exercise the traditional equity powers of a Court of Bankruptcy. The Court recognizes that normally a transfer made to benefit a third party is not made for a "fair" consideration.

### 6.

This is not the normal case in which diversion of corporate assets for the payment of the indebtedness of another calls for application of the rule that such a transfer is not supported by a "fair consideration". Authorities cited by plaintiffs, including Davis v. Hudson Trust Company, 3 Cir., 1928, 28 F.2d 740, and related cases are thus not in point. In none of the case cited by plaintiffs was it established that the item sought to be recovered by the trustee in bankruptcy consisted of funds originally supplied by the defendant transferee from whom recovery was sought. The distinguishing factor making inapplicable the authorities relied upon by plaintiffs is that equitably and legally Twin City here was obligated to make reimbursement to the Bank. The satisfaction of that obligation was satisfaction of an antecedent indebtedness within the meaning of the applicable provisions of the Bankruptcy Act, both in the definition of voidable transfers and in the protections afforded a bona fide obligee by the applicable provisions of the Chandler Act.

### 7.

The provisions of Section 67, sub. d (2)(d) invalidating transfers made with "actual intent" to "hinder, delay, or defraud either existing or future creditors" are, in the view of the Court, not applicable to the repayment of this $50,000 to the Bank under the circumstances that were present. There is no clear and convincing proof that in making the repayment Gray made it with actual intent to defraud the future creditors of Twin City Construction Company. Gray's fraud rather consisted in obtaining the bond by false representations. Once he had laid the basis for obtaining the bond, there is reason to believe that he did not consider that the repayment of the $50,000 to the Bank would affect his ability to carry out his contract at Blytheville, Arkansas, at a profit. He was utilizing the Gray organization and its central overhead and, to some extent, its credit position and it is more logical to conclude that he did not have the conscious and deliberate intent to defraud required by Section 67, subd. d(2)(d). The transfer was in payment of Gray's note to the Bank, but, as pointed out above, the transfer also satisfied an indebtedness of Twin City to the Bank. The circumstances all combine to support the inference that Gray was motivated by a desire to continue his business and to rehabilitate himself financially. The Court accepts Petty's testimony that Gray actually intended to pay his creditors, because he had worked out of bad situations before. The Court finds, therefore, that the repayment was not with actual intent to defraud. However, even if it be considered as part of an entire fraudulent transaction, the Court is of the opinion that the transfer is protected by Section 67, sub. d(6) which protects an obligee who, without actual fraudulent intent, accepts a transfer based upon an antecedent debt. The Bank was in good faith in accepting the payment. The Court concludes that the Bank, under the circumstances, is a "bona fide" obligee within the proviso and protection of Section 67, sub. d(6). Collier, Bankruptcy Manual, p. 858, states:

> "This proviso comes into play only after it has been determined that there has been a fraudulent conveyance and that the transferee is not a *bona fide* purchaser, lienor or obligee for a *present* fair equivalent value. Notwithstanding the absence of 'good faith' or 'a present' fair equivalent value, the transferee obtains protection to the extent of the consideration given by him if he can demonstrate his innocence of any intent to participate in the fraud perpetrated on the transferor's creditors. The new proviso seems to pro-

tect a transferee who without actual fraudulent intent has extinguished or accepted security for a debt owing by the bankrupt. If the antecedent debt amounts to a fair equivalent of the property transferred therefor, the transfer will presumably be upheld in full, although the transferee is technically not a 'bona-fide purchaser, lienor, or obligee for a *present* fair equivalent value'." (Emphasis supplied.)

As a *bona fide* obligee of Twin City, the Bank, the Court concludes, is entitled to retain the payment of funds represented by a reversal of the bookkeeping transfer when the check was issued to the Bank.

In the last analysis under the facts at issue, all that the Bank did was to receive reimbursement of a loan which it had made in good faith based on representations which did not reflect the true purpose in making the loan. The money was repaid within twelve days and never left the bank account. The Court does not believe the Chandler Act literally requires the Bank to repay the trustees under these circumstances. The harsh result contended for by the trustees is not within the intendment or purpose of the Statute. Recovery for the $50,125.00 item will, accordingly, be denied.

#### 8.

The Court does not consider the cases cited by petitioners in their brief support any right of recovery by the trustees under the circumstances here found. There does not seem to be direct judicial authority in which a recovery under the exact circumstances here involved was sought by a trustee in bankruptcy under Section 67, sub. d. Implications from cases to which analogy might be made would deny any right of recovery as applied to the facts before the Court and the Court deems this to be the correct conclusion applicable to the circumstances at bar. See Malone v. Gimpel, D.C. N.D.N.Y.1956, 151 F.Supp. 549, affirmed by the 2 Cir., 1957, 244 F.2d 954; Newfield v. Stieglitz, D.C.1942, 47 F.Supp. 885, affirmed Newfield v. Oosterhuis, 2

Cir., 137 F.2d 437; Cf. In re Venie, D.C. 1948, 80 F.Supp. 250.

The Court understands that counsel for the trustees have abandoned their contentions seeking recovery on the ground that the $50,000 repayment was *ultra vires*. Accordingly, the legal issues involved as to that aspect of the case will not be commented upon other than to say that they have been carefully considered by the Court and are found not to detract from the conclusions reached by the Court under the applicable bankruptcy statutes. The Court does not consider that the Uniform Fiduciaries Act, LSA–R.S. 9:3808, is here applicable in view of the full authority vested in Gray by the resolutions on file with the Bank and in further view of the fact that the repaid item of $50,000 was the same money which the Bank had placed in the account of Twin City at Gray's request when he made the loan.

## II. The $9,000 Transfer To The William A. Gray Account

### Findings of Fact

#### 1.

On December 28, 1955, within four months of the filing of the involuntary bankruptcy petition against Twin City Construction Company, Gray instructed the Pioneer Bank to transfer the sum of $9,000 from the checking account of Twin City Construction Company, maintained with the Bank, to the bank account of William A. Gray. A loan in the amount of $10,000 had been made by the Bank the same day and deposited to the account of Twin City Construction Company. The transfer was made by debit memorandum as per instructions. In issuing such instructions, Gray acted as President of Twin City Construction and acted pursuant to his full authority as evidenced by corporate resolutions furnished to and on file with the Bank (Exhibits D–2 & D–3). The Bank in good faith relied upon the authority vested in Gray in making the transfer pursuant to his request.

## 2.

The $9,000 so transferred inured to the benefit of W. A. Gray Construction Company in that it was used to cover disbursements made and charged to the checking account of W. A. Gray Construction Company. At the time of the transfer there was an overdraft in the account of W. A. Gray in the amount of $4,398.69 which had occurred in the normal course of business of W. A. Gray Construction Company. The balance, in the main, cleared disbursements made by W. A. Gray Construction Company to third parties.

## 3.

Overdrafts were not unusual in the normal conduct of the business of W. A. Gray Construction Company and deposits to cover overdrafts were frequently and normally made in connection with the handling of the checking account of W. A. Gray. The record establishes that such overdrafts occurred almost daily and it was the normal practice to cover such overdrafts by deposits in the W. A. Gray Construction Company account.

## 4.

The Bank did not, in fact, receive the $9,000 deposited in the checking account of W. A. Gray Construction Company but such funds were credited to the checking account of W. A. Gray Construction Company and were utilized to balance the account, including the payment of overdrafts.

## 5.

The Court finds as a fact that there was a considerable degree of commingling of the affairs of W. A. Gray Construction Company and Twin City Construction Company. The same office was occupied, the same personnel and central overhead staff was employed, and Gray, in practice, was using the W. A. Gray Construction Company in connection with the Twin City Blytheville contract being carried out.

## 6.

In the handling of the account of W. A. Gray Construction Company, including the crediting of the $9,000 to that checking account, the Bank had no reasonable cause to believe that either Gray or Twin City Construction Company was insolvent on December 29, 1955, when the debit memorandum transfer was effected. The insolvency of Twin City Construction Company as of that date is not conclusively shown. In accepting the deposit of $9,000, in giving the credit, and by paying the items subsequently paid and covering the previously paid items included in the overdraft, the Bank acted in good faith and furnished a fair consideration in the form of such payments and bank clearances. In keeping with the practice in such matters the withdrawal of Gray was later entered as a receivable from Gray but it is clear that Gray was insolvent at the time. The Bank did not have reasonable cause to believe that Gray was insolvent on December 29, 1955.

## Conclusions of Law

### 1.

The Trustees in Bankruptcy attacked the transfer of $9,000 above referred to under Section 67, sub. d(2) and also as voidable under State law by virtue of the provisions of § 70, sub. e(1), 11 U.S.C.A. § 110, sub. e(1).

### 2.

Without dispute, W. A. Gray had authority to make the transfer of the $9,000 pursuant to resolutions on file with the Bank and the Bank, as a matter of law, was entitled to rely upon that authority, including the provision in the corporate resolution of authority which provides as follows:

> "Be It Further Resolved, That W. A. Gray, President, be and he is hereby empowered and authorized to do any and all acts whatsoever on such terms and conditions and for such considerations, within his discretion, that this corporation could do if a natural person, this authority conferred being intended to authorize the said W. A. Gray as President to represent this corporation in all matters whatsoever and to confer on

him the fullest possible powers in such representation."

**3.**

Under section 67, sub. d(2) of the Bankruptcy Act, if the Bank has furnished "a fair consideration" for the transfer of the $9,000 by debit memorandum, the transaction is excepted from the reach of Section 67, sub. d(2) and is not voidable in an action brought by the trustees. Interpreting and applying Section 67, sub. d(2) to the facts, the Court concludes that the crediting of the account of W. A. Gray Construction Company with the $9,000 and the clearance of items against that credit, including clearance of the $4,398.69 overdraft which had occurred in the normal and regular course of business, was the furnishing of a "fair consideration". Whether fair consideration is present in a particular case depends on all the facts and circumstances. See 4 Collier on Bankruptcy, Sec. 67.33, pp. 345–350. Because of the commingling of the affairs of Twin City Construction Company with those of W. A. Gray Construction Company and because of Gray's status as sole stockholder with full corporate authority (D–3) upon which the Bank actually relied, the Bank could not, in its dealings with him, have disregarded that authority especially where it had positive knowledge that the funds being transferred were in fact being used to cover clearances against the bank account representing, in the main, items payable by W. A. Gray Construction Company in connection with its construction business. By accepting the deposit, by giving the credit, and by paying the items already overdrawn, in good faith, the Court concludes as a matter of law that the Bank was furnishing a fair consideration for the deposit so received.

**4.**

The Uniform Fiduciaries Act adopted in Louisiana as LSA–R.S. 9:3801 et seq. does not entitle the trustees to recover under Section 70, sub. e(1) of the Bankruptcy Act. The purpose of the Uniform Fiduciaries Act is to protect a depository bank which acts in good faith without positive knowledge that a breach of trust is being committed. The act even recognizes the right of a fiduciary to transfer the funds from a fiduciary account to his personal account, LSA–R.S. 9:3809. The Pioneer Bank & Trust Company was not required to make inquiry as to whether the fiduciary (W. A. Gray) was committing a breach of his obligation in transferring funds from the bank account of Twin City to that of W. A. Gray Construction Company. Especially is the Uniform Fiduciaries Act here applicable to protect the defendant Bank because the record establishes that it was making loans in good faith to both Gray and the corporation to finance construction contracts being carried out by Gray and Twin City and in practical effect Gray was Twin City.

**5.**

In the relationship between Bank and depositor, the Courts, in applying Section 60, sub. b of the Bankruptcy Act have looked with favor upon the position of the depositary bank and have protected the bank even when an insolvent depositor makes deposits in the course of business to cover an overdraft. Although the circumstances involved in this $9,000 transaction do not involve a voidable preference, the Court concludes that what occurred, under all of the facts and circumstances, cannot be viewed as a voidable transfer to the Bank within the meaning of Section 67, sub. d(2).

**6.**

Interpreting and applying 67, sub. d (2) (b), and (c) to the facts of this case, an important fact preventing recovery by the Trustees in Bankruptcy for this item is that this $9,000 was not transferred to the Pioneer Bank. The money was transferred to the checking account of W. A. Gray Construction Company and in fact inured to the benefit of W. A. Gray. The Bank was merely a depositary conduit through which the money passed. In this connection, the Court observes that in Civil Action No. 5445, on the Docket of this Court, the com-

plainants, as Trustees of W. A. Gray Construction Company are seeking recovery of the same $4,398.69 overdraft on the theory that it was money belonging to Gray improperly paid to the Bank as a preference. Applying the law to the facts, we reach the conclusion that the $9,000 so transferred was transferred to W. A. Gray Construction Company and not to the Bank and we find no facts and circumstances to justify a recovery of any portion of the $9,000 item predicated upon any of the provisions of Section 67, sub. d(2) of the Bankruptcy Act.

The trustees have cited Articles 1970, 1971, 1980, 1984 and 1985 of the LSA–Civil Code of Louisiana and the decision of this Court in Mayo v. Petty, D.C. 1957, 153 F.Supp. 501, in favor of the Trustees in Bankruptcy, setting aside a deed as a voidable preference and a constructive fraud. The Court has considered these provisions of law and finds that they are not applicable to the facts here. Their application in Mayo v. Petty was to circumstances quite distinguishable from the facts before us, as will appear from that decision.

III. The $10,000 Pledge-Agreement Repaid Loan Of Twin City Construction Company

Findings of Fact

1.

On December 29, 1955, Twin City Construction Company borrowed $10,000 from the Pioneer Bank & Trust Company. Simultaneously with the loan, the Bank took a pledge agreement in keeping with its usual practice in making loans to finance construction contracts of W. A. Gray (Exhibit D–10). The written pledge agreement given by Twin City to the Bank, under date of December 29, 1955, specifically recites: "We pledge the balance due on this contract to secure a loan in the amount of $10,000.00 for a period of thirty (30) days." (See last paragraph of Exhibit D–10.) The contract referred to, covered by the pledge, was the government contract for the rehabilitation of buildings at the Blytheville, Arkansas, Air Force Base.

2.

The loan was made to Twin City Construction Company within the four months period prior to the filing of the involuntary bankruptcy petition against Twin City Construction Company. Twelve days after the loan was made, the proceeds thereof were made available to Twin City Construction Company, the loan was repaid in full on January 10, 1956, by debit memorandum against the account of Twin City Construction Company in the amount of $10,020 (Exhibit D–14).

3.

The Court finds as a fact that the payment of January 10, 1956, was made by Twin City in full recognition and confirmation of the validity of the pledge agreement of December 29, 1955, the payment having come directly from the proceeds of a check of the United States Government in the amount of $11,693.18 (Exhibit D–13), which was deposited to the account of Twin City Construction Company (see Exhibit D–12). The Court further finds as a fact that the $10,020 payment of the note was made on the same date and in connection with the deposit of the proceeds of the government contract as referred to and the Bank thereupon marked the note paid and returned it to Twin City Construction Company.

4.

The Court further finds as a fact that the debit memorandum of $10,020 was merely the means whereby Twin City Construction Company elected to carry out its obligation of recognizing and ratifying the pledge agreement under which the collected proceeds were required to be made available to the Bank in settlement of the loan that had been made only twelve days earlier.

5.

Notice of the letter pledge agreement above referred to was not given to the United States Government; but thereafter, within a period of twenty-one

days from the date of the loan, to-wit, on January 10, 1956, twelve days after the loan, the proceeds of the government contract were paid to Twin City Construction Company and utilized by it to the extent of the $10,020 which retired the note.

## Conclusions of Law

### 1.

■ The Trustees in Bankruptcy seek recovery of the $10,020 payment as a voidable preference under Section 60, sub. b of the Bankruptcy Act. The position of the Bank is: (1) that the letter pledge agreement of December 29, 1955 (Exhibit D–10), created a valid pledge so that the payment to the Bank, a secured creditor, was not preferential; (2) it is further contended by the Bank that even if the pledge did not create a valid pledge initially for lack of notice to the Government, the pledge was thereafter perfected by actual receipt of the money within twenty-one days from the date of the loan and act of pledge; (3) that non-compliance with the Federal Assignment of Claims Act does not affect the Bank's right. These contentions are all disputed by the trustees.

### 2.

Under the provisions of Section 60, sub. a(7) of the Bankruptcy Act, if it be conceded *arguendo* that the letter pledge agreement required additional action by the Bank to protect its security interest under the written pledge, it nevertheless clearly appears that the repayment of the money to the Bank (i. e., reducing the pledged fund to possession) had the legal effect of protecting and perfecting the lien of the pledgee and if this was accomplished within twenty-one days of the original loan, the transaction is protected by the Bankruptcy Act. Section 60, sub. a(7) provides:

"(7) Any provisions of this subsection a to the contrary notwithstanding, if the applicable law requires a transfer of property other than real property for or on account of a new or contemporaneous consid-

eration to be perfected by recording, delivery, or otherwise, in order that no lien described in paragraph (2) of this subsection could become superior to the rights of the transferee therein * * * the time of transfer shall be determined by the following rules:

"1. Where (A) the applicable law specifies a stated period of time of not more than twenty-one days after the transfer within which recording, delivery, or some other act is required, and compliance therewith is had within such stated period of time; or where (B) *the applicable law specifies no such stated period of time* or where such stated period of time is more than twenty-one days, and compliance therewith is had within twenty-one days after the transfer, the transfer shall be deemed to be made or suffered at the time of the transfer. * * *" (Emphasis supplied.)

It is plain that under Section 1(30) (11 U.S.C.A. § 1, as amended) of the Bankruptcy Act the term "transfer" includes the fixing of a lien or the perfection of a security interest. That section of the statute reads:

"(30) *'Transfer' shall include* the sale and every other and different mode, direct or indirect, or disposing of or of parting with property or with an interest therein or with the possession thereof or of *fixing a lien upon property or upon an interest therein,* absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, assignment, payment, *pledge,* mortgage, *lien,* encumbrance, gift, security, or otherwise; the retention of a security title to property delivered to a debtor shall be deemed a transfer suffered by such debtor; * * *." (Emphasis supplied.)

Section 60, sub. a(7) of the Bankruptcy Act was amended in 1950 to clarify and change the rule of law announced by the Supreme Court in the Klauder

case, Corn Exchange Nat. Bank & Trust Co., Philadelphia v. Klauder, 318 U.S. 434, 63 S.Ct. 679, 87 L.Ed. 884. (See Collier, Manual of Bankruptcy Law, 1951 Supplement Section 60.121, discussing the Klauder case and the effect of the 1950 amendment.) Prior to the 1950 amendment if the Bank had made a loan to Twin City Construction Company within the four months period and taken a pledge agreement covering the contract proceeds, but it failed to notify the debtor of the credit (assuming Louisiana requires such notification), the Bankruptcy Act recognized the pledgee's lien as perfected only when the security interest was perfected by the required notice (or by the delivery to the pledgee of the thing pledged or by the payment of the money). The 1950 amendment had for its purpose the protection of those transactions which were inchoate, but were perfected within twenty-one days. It is the Court's conclusion that Louisiana law specifies no period of time in which the pledge of proceeds of a contract must be perfected by notice to the obligor. Consequently, under the literal provisions of Section 60, sub. a(7), the Bank, in making the loan to Twin City, in harmony with the Bankruptcy Act, could have perfected its lien under State law by notice to the debtor or by obtaining the proceeds within twenty-one days, the latter being not only a perfection, but a satisfaction of the lien. Cf. LSA–Civil Code Articles 3156, 3157, 3152 and 3153. It is our conclusion, in applying Section 60, sub. a(7) to the facts here found, that this is not a voidable preference, as a matter of law, because in receiving the payment the Bank was only doing what the Bankruptcy Act expressly permits and what State law sanctions. A more complete discussion of this subject and the relationship of this problem to the Klauder case and its background is found in Collier's Bankruptcy Manual (1951 Supplement), paragraphs 60.121 et seq. We conclude that the facts call for the application of Section 60, sub. a(7) and that the protection of that provision is directly applicable and available

to defendant here. Even if it be conceded, as counsel for the trustees have argued, that the Bank's pledge was not complete for lack of notice to the obligor, the Government, its payment of the proceeds and Twin City's application thereof to the debt it had endeavored to secure, for a contemporaneous consideration—the loan—served to perfect the lien under a fair and reasonable interpretation of the Bankruptcy Act, in the light of the 1950 amendment.

### 3.

While the Court does not consider it necessary to base its conclusion denying recovery of the $10,000 item upon the validity of the original pledge, the Court nevertheless concludes on the basis of LSA–R.S. 9:4321–4323 that the letter pledge agreement executed in favor of defendant would of itself be sufficient to constitute a valid pledge without the necessity of notification to the debtor. That statute does not appear affirmatively to require the formality of notice to the debtor to make the pledge valid as to third persons. Only the obligor, whose obligation is intended to be pledged, is intended to be protected by the requirement of notice, "to bind the obligor to pay the amount due to the pledgee" (LSA–R.S. 9:4323). When this provision is considered in the light of the repealing clause, in Section 2 of Act 95 of 1938, it appears to the Court that the Louisiana Statute relied upon by defendant is sufficient to entitle the Bank to the status of a secured creditor under Louisiana law. It follows that the payment to the Bank was not preferential and voidable.

### 4.

In opposition to these conclusions of law it has been argued that there can be no valid assignment or pledge of a claim against the United States Government under a government contract without compliance with the provisions of Assignment of Claims Act, 31 U.S.C.A. § 203, and that any such attempted pledge is void. National Bank of Com-

518

merce of Seattle v. Downie, 1910, 218 U.S. 345, 31 S.Ct. 89, 54 L.Ed. 1065. The Court finds that the Downie case is not applicable and that this aspect of the argument of the trustees is disposed of adversely to their contentions by the case of M. M. Landy, Inc., v. Nicholas, 5 Cir., 221 F.2d 923, 927, 53 A.L.R.2d 1385, where the Court held:

"We conclude, then, that failure to comply with the Federal Assignment of Claims statute is immaterial in the decision of this case. By stipulation, Landy's security interest is not protected by the methods provided by this statute. Nevertheless, we recognize that there may be alternative ways of perfecting a security interest in a claim against the Government, under State law, which are valid as against a trustee or receiver in bankruptcy."

In our view, the pledge of the proceeds of a government contract is not voidable, although the provisions of the Federal Statute have not been complied with procedurally, if it appears that the proceeds of the claim pledged and assigned actually have been reduced to possession and no interest on the part of the Government is involved. In other words, that Statute is purely for protection of the Government. See Martin v. National Surety Company, 1937, 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822, holding, in effect, that assignments will be recognized as valid, even though not in conformity with the Federal Statute, if the proceeds have been collected and the matter is thus beyond the original purpose of affording protection to the Government. The conclusions which we reach, in our view, are amply supported by an extensive annotation found in 12 A.L.R. 2d 468. To sum up, we conclude that the Assignment of Claims Statute is only for the protection of the Government and that as between the parties herein no government interest is involved. An assignment which is valid under local law will be recognized against the claim of a trustee in bankruptcy where a valid pledge exists under local law.

5.

Even should this Court conclude that the Bank is not a secured creditor, under Federal law applicable to set-offs it would follow that the Bank would be protected on the $10,020 payment for it held the note of Twin City Construction Company and would have been entitled to offset the deposit against the note. See the following cases: New York County Nat. Bank v. Massey, 1904, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380; Studley v. Boylston Nat. Bank, 229 U.S. 523, 33 S.Ct. 806, 57 L.Ed. 1313; American Bank & Trust Co. v. Morris, 5 Cir., 1927, 16 F.2d 845; Hill v. Jersey Shore State Bank, U.S.D.C.Pa.1949, 87 F.Supp. 129; Kane v. First National Bank of El Paso, Texas, 5 Cir., 1932, 56 F.2d 534, 536, 85 A.L.R. 362, certiorari denied, Kane v. Pottorff, 287 U.S. 603, 53 S.Ct. 8, 77 L.Ed. 524; Citizens' National Bank of Gastonia, N. C. v. Lineberger, 4 Cir., 1930, 45 F.2d 522; Fourth National Bank of Wichita, Kan. v. Smith, 8 Cir., 1916, 240 F. 19; Drugan v. Crabtree, 4 Cir., 1924, 299 F. 115. This Court recently applied this principle in the case of Harper v. First National Bank in Mansfield, D.C., 169 F.Supp. 321. On the same subject matter, 3 Collier on Bankruptcy (15th Edition) pp. 760 et seq., we find the following:

"Obviously, where the bank has not knowledge or imputation of knowledge, or 'reasonable cause to believe' that the depositor is insolvent, such routine deposits are clearly available as setoffs. *But even though the depositor was insolvent and knowledge of this fact could be charged against the bank at the time when the deposit was made, the bank is still entitled to apply the deposit on its claim, so long as it was accepted in good faith, in the ordinary course of business.* It is only where affairs have reached such a point that the bank accepts the deposit for the purpose of payment or of giving itself a subsequent advantage over other creditors through its right of set-off, or for some other

special purpose, that the deposit and the subsequent application of it amounts to a recoverable preference." (Emphasis supplied.)

6.

Summarizing our conclusions of law as to this claim the Court finds that the requisites of a voidable preference, under Section 60, sub. b, are not present. It is the conclusion of the Court that the Bank had a valid security interest, that it perfected its lien by receiving payment within twenty-one days, and that the Federal Assignment of Claims Statute is no obstacle to recognition of the position of the Bank as a secured creditor. For these reasons, the Court concludes that there is no merit in the claim of the trustees for the recovery of this item.

For all of the foregoing reasons, plaintiffs are not entitled to recover from defendant on any of their claims.

A proper decree should be presented on notice.